**NATIONAL DAIRYMEN ASS'N, Inc. v. DEAN MILK CO.**

No. 10025.

United States Court of Appeals, Seventh Circuit.

June 16, 1950.

Rehearing Denied Aug. 10, 1950.

SWAIM, Circuit Judge.

The principal question presented on this appeal is whether a series of written communications between the parties resulted in the formation of a contract and an anticipatory breach thereof by the defendant. The District Court concluded that a valid contract had been entered into; that since no time for performance had been specified, performance was to be within a reasonable time; and that a reasonable time had not yet elapsed when the defendant, Dean Milk Company, breached the contract by repudiating the contract and by refusing to be bound. Judgment was entered for the plaintiff, National Dairymen Association, in the amount of $83,918.20.

The transaction between the parties was started on May 16, 1946, when the defendant sent the following letter to the plaintiff.

"We are very much interested in helping to feed the nations of Europe who are in dire need of foodstuffs. We offer you 60,-000 cases Evaporated Milk for reasonably prompt shipment after confirmed letter of credit has been opened, for $4.55 per case, F.O.B. Factory, net cash, packed in export double strapped solid fibre cases.

"This offer is subject to the government's acceptance for export and if a permit is issued for us to ship on above basis, we will try to get you additional quantities at that time. These additional quantities will possibly be well in excess of the above amount on which we are giving you a firm offer today.

"This tender is made with the understanding we are to have a firm reply within two weeks from this date.

"This is all fresh packed milk guaranteed United States government standard in every respect."

The plaintiff's first communication in reply was a letter dated May 25, 1946, as follows:

"I am trying to have a few export licenses cleared together with fair rate of exchange so that we can ship some milk abroad; will be in further touch with you.

"Mr. Dean thought you might like to figure on supplying us with substantial

Fred A. Gariepy, Chicago, Ill. (John Spalding, Chicago, Illinois, of counsel), for appellant.

George W. Lennon, Chicago, Ill., Jay Stough, Daniel M. Schuyler, Chicago, Ill., for appellee.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

volume—we to supply containers—of this product; 9% butterfat 31% solids. I should like to have your early reply."

Two days later, May 27, 1946, the plaintiff sent to the defendant the following telegram: "This replies to your offer May 16 and to advise that we accept this offer of sixty thousand evaporated milk. Please advise delivery schedule."

Following the receipt of the above telegram, defendant wired plaintiff May 28, 1946, as follows: "Can ship 30,000 or 40,000 cases promptly Stop Must have letter credit apply against railroad bills of lading also export permit license before loading Stop This will need your immediate attention Stop Must have OPA authorization account over ceiling price Stop Writing airmail."

The letter referred to in this telegram, also dated May 28, 1946, stated in part:

"There is so much upset in Washington on account of the possibility that the subsidy on milk will be eliminated July 1 and what we will pay for milk after that we are unable to guess. We certainly must get out at once all orders we have booked and that is the reason we wired you this morning that we must have a letter of credit open here in Chicago to apply against the railroad bills of lading. In view of the Maritime strike on June 15 we would not care to sell the milk on any other basis than domestic bills of lading. After that it is up to the buyer to get this milk on the boats or handle any other way that he chooses.

"More important than getting this letter of credit is that we must first obtain OPA authorization to bill this out at the price agreed upon, namely $4.55 net cash, F. O. B. plant. We understand the railroads want the authorization for export because of the congestion in the east.

"It will be necessary for you, Mr. Altman, to move fast on this if we are to get this order shipped. We cannot take any chances shipping without OPA authorization, the export permit license, and the letter of credit."

May 31, 1946, plaintiff sent defendant the following telegram: "Referring your telegram May 28. How soon could you ship balance our order? Will you deliver additional 40,000 cases $4.68? Please wire reply."

Plaintiff received no answer to the above telegram and on June 6, 1946, sent the defendant the following telegram: "Only if necessary will you store without charge for how long. Please reply our telegram May 31 also can you supply product 9% fat 31% solids would pay premium. Refer our telegram May 29 what allowance portion domestic packing if expedient. Are committed complying according our arrangements evaporated milk. Delivery instructions will follow due time."

Defendant then wired plaintiff on June 7, 1946: "We regret we are unable to confirm our offer made on May Sixteenth account your being unable to get export license also OPA confirmation of price for prompt shipment."

About a week after this last telegram from the defendant to the plaintiff, Mr. Altman, the president of plaintiff, came to Chicago to see Mr. Dean, President of the defendant company, to urge performance by defendant. While in Chicago Altman threatened legal action to force performance by defendant. On June 26, 1946, defendant sent the following telegram to the plaintiff: "Dean Milk Company hereby notifies you of withdrawal of its offer heretofore made to you in regards to sale of sixty thousand cases of evaporated milk for good cause shown. We want no further correspondence or negotiations with you on this subject and declare same cancelled and terminated."

The determination of the principal question of this appeal depends upon the interpretation of the offer made by the defendant to the plaintiff by defendant's letter of May 16, 1946. The defendant takes the position that the statement in that letter that "this offer is subject to the government's acceptance for export * * *." is a condition precedent which plaintiff must have complied with before, or at the time of, accepting the offer. The defendant contends that since this condition was not met at the time of plaintiff's telegram of acceptance dated May 27, the offer and the acceptance did not

352

constitute a binding contract. Defendant further contends that the price quoted in the offer was above the O.P.A. ceiling and that the offer and the alleged contract were therefore illegal, or, that the requirement of an O.P.A. approval was an implied condition of the original offer.

On the other hand the plaintiff points out that the offer was stated to be a "firm offer" and was made "with the understanding we are to have a firm reply within two weeks from this date." Plaintiff insists that under a proper interpretation of the offer, the requirement of an export permit was not a condition precedent to plaintiff's acceptance but was only a condition precedent to defendant's obligation to perform. If this contention is correct, then the telegram of acceptance by the plaintiff on May 27 was effective to bind both parties to a sale on the terms and conditions of plaintiff's offer.

The offer which defendant made to plaintiff was for 60,000 cases of evaporated milk at $4.55 per case, f. o. b. factory, net cash, packed for export. The offer promised reasonably prompt shipment "after confirmed letter of credit has been opened" and stated that the "offer" was subject "to the government's acceptance for export."

The trial court interpreted this offer and plaintiff's acceptance as constituting a valid contract. We think this interpretation was correct.

The defendant stressed the fact that by the wording of the sentence as to the government's acceptance, it was the *offer* which was made subject to the government's acceptance, and contends, therefore, that the government's acceptance was a condition precedent to the acceptance and to the making of a contract. In the next to the last paragraph of this letter of offer, after the terms and conditions of the proposed sale had been stated and after defendant had stated that the offer was subject to the government's acceptance for export, the letter stated, "this tender is made with the understanding we are to have a firm reply within two weeks from this date." When we consider the defendant's letter as a whole, we do not think that it was an offer

to consummate within two weeks a sale on the terms and conditions stated, but was an offer to enter into a binding contract within two weeks for a sale in the future on such conditions. All the offer expressly asked for within the two week's period was a "firm reply", an acceptance of the offer as made, an acceptance on which the defendant could rely, an acceptance which would give the parties a binding contract embracing all of the terms, conditions and qualifications of the defendant's offer.

Within the time limit fixed by the defendant, and before the offer had been withdrawn, the plaintiff by its telegram of May 27 identified the defendant's offer and said, " * * * we accept this offer * * *". This was a complete and unqualified acceptance. The parties then had a binding contract by which the defendant agreed to sell and the plaintiff agreed to buy—all pursuant to the terms and conditions of defendant's offer, including the condition that plaintiff should secure the required "government's acceptance for export".

In its brief the appellant has devoted much space and cited many cases in support of the well established principle that where the performance of some act, or the occurrence of some event is necessary to the formation of the contract, the act or event is a condition precedent to the making of the contract. We have no criticism of that rule, but think it has no application to this case. Whether the act in question was necessary to the formation of the contract depends upon the interpretation of the offer. The defendant stresses the decision in Campbell Investment Company v. Taylor, 246 Ill.App. 433, as a guide in the interpretation of the offer in the instant case. The offer in that case, however, was entirely different. It stated: "In the event you and your associates underwrite the amount required to remodel the Burlington Building, we will * * *." That offer clearly asked for action, instead of a promise to act, before the party making the offer would be bound. The court there properly so held. Here the offer, considered as a whole, asked, not for action within two weeks, but for a firm reply, a promise. We think this inter-

pretation is clearly required by the language of the offer.

If the interpretation were doubtful, recognized rules of construction on such a question would require us to construe this offer as calling for a bilateral contract. In the American Law Institute's Restatement of Law of Contracts, Vol. 1, § 31, p. 39, the following rule for the construction of such offers is given: "In case of doubt it is presumed that an offer invites the formation of a bilateral contract by an acceptance amounting in effect to a promise by the offeree to perform what the offer requests, rather than the formation of one or more unilateral contracts by actual performance on the part of the offeree."

Immediately under this statement of the rule we find this comment: "It is not always easy to determine whether an offeror requests an act or a promise to do the act. As a bilateral contract immediately and fully protects both parties, the interpretation is favored that a bilateral contract is proposed."

Defendant contends that plaintiff's letter of May 25 proves that plaintiff understood the offer as requiring the procurement of the government's acceptance because in that letter the plaintiff stated that it was trying to have a few export licenses cleared. On this subject the defendant said, "had plaintiff thought that *performance of the contract* was subject to the government's acceptance for export, plaintiff would not, prior to acceptance of the offer by a promise, have written defendant that plaintiff was trying to procure export licenses 'so that we can ship some milk abroad.'"

An equally reasonable interpretation would seem to be that plaintiff was investigating the possibilities of procuring government's acceptance for export before plaintiff would, by its reply, bind itself to perform.

Defendant also stresses the fact that the offer specified a period of two weeks for reply and argues that if the government's acceptance was not to be procured before the reply to the offer, the reply could have been given by return mail. In this argument defendant seems to overlook the fact that the reply was to be an unqualified acceptance of the offer which would bind plaintiff; that the transaction involved 60,000 cases of milk, a total purchase price of $273,000.00, the opening of a letter of credit, procuring of the government's acceptance and that this milk could only be sold for use in a foreign market—all matters which would have to be investigated and planned before plaintiff could safely bind itself to perform.

The final argument of defendant on this point was that if the defendant was contractually bound without issuance of an export permit, then the plaintiff might have procured delivery and have re-sold the milk in the domestic market; thus thwarting defendant's purpose to sell only for export. This would have been impossible. There has been no contention on the part of anyone that the procurement of the government's acceptance for export was not a condition precedent to performance by the defendant.

In the communications between the parties subsequent to the offer and acceptance we find evidence that the defendant considered the government's acceptance as a condition precedent to performance, and not to the making of a contract. On May 28, the day after plaintiff's acceptance, the defendant sent plaintiff a telegram and a letter. In the telegram the defendant said, "can ship 30,000 or 40,000 cases promptly, must have letter credit apply against railroad bills of lading also export permit license before loading." This language would indicate that the defendant considered the letter of credit and the export license as being in the same category, as conditions precedent to defendant's performance. Counsel for the defendant attempts to explain this language by saying that "defendant justifiably believed that plaintiff had *obtained* an export license and for that reason that there was a valid contract, subject to price approval." There had been no statement by plaintiff that an export license had been obtained. Plaintiff just two days prior to its acceptance had only said that it was "trying to have a few export licenses cleared." It would have been just as reasonable to have concluded that instead of obtaining the export licenses the plaintiff

had learned that, if and when plaintiff contracted for the purchase of the milk it would be able to procure the export licenses. This was evidently the conclusion of the trial court. The statement of counsel, as to what defendant believed, was not supported by any evidence. Mr. Dean, the defendant's president, testified in the trial of this case but was asked no question on this subject.

Both the language of the offer as a whole, and the evidence as to the interpretation by the parties supports the conclusion of the trial court that the offer was for a bilateral contract requiring only the acceptance by the plaintiff for the formation of a binding contract.

The defendant's next contention is that even if there had been a binding contract between the plaintiff and defendant, the plaintiff repudiated the contract and defendant was, therefore, justified in treating it as abandoned. The defendant supports this contention by stating that the evidence establishes that plaintiff was merely speculating at defendant's risk; that plaintiff intended to perform an agreement different from that made; that plaintiff intended to so perform only if performance would be profitable to plaintiff; and that this was in effect a repudiation of the contract which justified defendant in treating the contract as having been abandoned.

■ The fallacy in this argument is that the trial court failed to find that any such facts were established by the evidence, but instead found that: "At all times after said contract had been entered into and up until June 26, 1946, plaintiff was ready, willing and able to comply with said contract." Considering all of the evidence, we cannot say that this finding was clearly erroneous. The finding must, therefore, be accepted as stating the facts. The defendant stresses the fact that the plaintiff in its telegram of June 6 inquired as to the possibility of an allowance for domestic packing and also as to the possibility for temporary storage by the defendant. Both inquiries were understandable in view of statements in defendant's letter of May 28, concerning a threatened Maritime strike; that defendant would only sell on basis of domestic bills of lad-

ing; and that "after that it is up to buyer to get this milk on the boats or *handle any other way that he chooses.*" (Emphasis supplied.)

■ The defendant also insists that the price of $4.55 per case quoted in its offer of May 16 was above the OPA ceiling price and that a contract made by the acceptance of that offer was illegal and therefore unenforceable. However, the offer as made expressly provided that the offer might be accepted at any time within two weeks from May 16. It was an offer which in effect was a continuing offer and renewed each day until it was accepted on May 27. There was evidence from which the District Court could, and did find that on May 27, the date the offer was accepted, the maximum ceiling on such a sale had been raised to $4.70 per case, including packing for export. Prior to the acceptance there was no contract. On the date of the acceptance the quoted price of $4.55 was well within the OPA ceiling price. The contract when made was, therefore, valid. The validity of a contract is determined, not as of the date the offer is made but as of the date the contract is made, here as of the date of the acceptance of the offer. People ex rel. Fursman v. City of Chicago, 278 Ill. 318, 116 N.E. 158, L.R.A.1917E, 1069; Belleville · Advocate Printing Co. v. St. Clair County, 336 Ill. 359, 168 N.E. 312.

As said in 12 Am.Jur., page 659, § 164: "Generally speaking, it is the law in force at the time the transaction is consummated and made effectual that must be looked to as determining its validity and effect."

■ The defendant also interjected the defense of impossibility of performance due to War Food Orders 148 and 148-1, 11 Fed. Reg. 5995, 5996, promulgated by the Department of Agriculture, effective June 1, 1946. These orders required producers of evaporated milk to set aside and hold for sale and delivery to any designated agency 60% of their June production. The trial court found, however, and there is adequate evidence to support the finding, that these orders did not prevent the defendant company from complying with its contract prior to the date defendant repudiated its contract.

The plaintiff's complaint alleged the making of the contract, performance by the plaintiff and the refusal of the defendant to perform. The answer denied the making of the contract and also denied performance by the plaintiff. The trial court found that the repudiation of the contract by the defendant excused performance by plaintiff. The defendant insists that since plaintiff did not prove the case alleged in the complaint, there can be no recovery. On this point the defendant relies on several Illinois cases (not controlling on procedure in federal courts) and on several cases which were not decided under the Federal Rules of Civil Procedure, 28 U.S.C.A.

Rule 7 of the Rules of Civil Procedure provides that a reply to an answer will not be allowed except when ordered by the trial court. Rule 8(d) provides that averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided. Rule 15(b) provides that when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. A consideration of the entire record here and of the applicable Rules of Civil Procedure convinces us that here, as in Pennsylvania Casualty Company v. Miller, 7 Cir., 145 F.2d 292, the pleadings may be considered as amended to cover the issues which were tried and decided.

We are also of the opinion that the trial court correctly determined the amount of plaintiff's damages as being the difference between the contract price at which defendant had contracted to sell and the market price on the date of defendant's repudiation of the contract, June 26, 1946, plus interest. There is authority in the decisions of the Illinois Supreme and Appellate Courts for allowance of interest on the amount of damages in such a case as this "where damages are ascertainable by computation of the difference between the contract price and the market price." Sterling-Midland Coal Company v. Great Lakes Coal and Coke Company, 266 Ill.App. 46, 57.

The judgment is affirmed.

KERNER, Circuit Judge (dissenting).

I regret I am unable to agree with the majority. The defendant's offer to sell the milk to plaintiff expressly stated that "this offer is subject to the government's acceptance for export * * *." The government's approval for export was therefore a condition precedent, the procurement of which was essential before the offer could be accepted by a promise. The government never approved the milk for export. Consequently there was no contract between the parties.

I would reverse the judgment.