**FLINTRIDGE STATION ASSOCIATES, Plaintiff-Appellant,**

v.

**AMERICAN FLETCHER MORTGAGE COMPANY and American Fletcher National Bank, Defendants-Appellees.**

**No. 83–3039.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1984.

Decided May 9, 1985.

As Amended on Denial of Rehearing and Rehearing En Banc June 24, 1985.

---

John A. Chandler, Sutherland, Asbill & Brenna, Atlanta, Ga., for plaintiff-appellant.

Theodore R. Boehm, Baker & Daniels, Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and DUMBAULD, Senior District Judge.*

BAUER, Circuit Judge.

Flintridge Station Associates (Flintridge) filed suit against the American Fletcher Mortgage Company (Mortgage Company) and the American Fletcher National Bank (Bank) for violations of the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1971 *et seq.* (1982), which allegedly arose in connection with a loan from the Mortgage Company to Flintridge. The complaint also alleged three pendent state law claims for tortious interference with a business relationship, breach of fiduciary duty, and breach of contract. The district court granted summary judgment in favor of the defendants on the Bank Holding Company Act claim and on each of the three pendent claims. We affirm the judgment of the district court.

## I. BANK HOLDING COMPANY ACT CLAIM

During the summer of 1975, Flintridge was a limited partnership formed to build and operate a shopping center in Atlanta, Georgia. At that time, Flintridge approached American Fletcher Mortgage Company to obtain financing for the proposed project. The Mortgage Company is in the business of arranging and administering financing for the development of real estate projects. Flintridge needed both a short-term construction loan to build the center and a long-term loan to "takeout" the construction loan. On October 6, 1975, the Mortgage Company issued a written commitment to lend Flintridge $2,550,-000 in construction funds subject to various conditions. One of those conditions was that the Mortgage Company would have the right to secure a permanent loan commitment to pay off the construction loan when the construction was completed. The commitment agreement specifically provided:

GENERAL CONDITIONS:

\*   \*   \*   \*   \*   \*

6.   American Fletcher Mortgage Company, Inc. is to have the exclusive right to arrange permanent mortgage financing on this property.

\*   \*   \*   \*   \*   \*

SPECIAL CONDITIONS:

\*   \*   \*   \*   \*   \*

3.   This commitment is contingent upon American Fletcher Mortgage Company, Inc. obtaining a participating lender(s) satisfactory to us.

R. 2, ex. 15A. On October 17, 1975, Flintridge accepted the Mortgage Company's commitment. American Fletcher National Bank later became a 100% participant.

The Mortgage Company secured a permanent loan commitment for Flintridge in February 1976 from State Farm Insurance Company, and began disbursing funds for construction in March 1976. Flintridge began encountering financial difficulties shortly thereafter when it expanded the shopping center to include outlots, or buildings placed in areas of the parking lot, and began developing those areas without having secured additional funds. Flintridge then sought more construction funds from the Mortgage Company and therefore needed a larger permanent loan to support the larger construction loan.

By October 1976 Flintridge was in default on its obligations under the construction loan and liens were being filed against the construction project. Pursuant to its rights under the October 6, 1975, loan com-

---

* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, is sitting by designation.

mitment letter which stated that the "[Mortgage Company is] to have an assignment of all leases and/or rents for the tenants," the Mortgage Company directed the existing tenants to send rents directly to the Mortgage Company. On June 6, 1977, the Mortgage Company's construction loan matured and was not paid. The Mortgage Company gave notice that it intended to protect its interests by exercising its right to a nonjudicial foreclosure. On July 1, 1977, Flintridge filed a voluntary petition for a reorganization in the United States District Court for the Northern District of Georgia under Chapter 12 of the Bankruptcy Act of 1898. Act of July 1, 1898, ch. 541, 30 Stat. 544 (as amended), *repealed by* Pub.L. No. 95–598, 92 Stat. 2641 (1978). At the time that this action was filed on appeal, the only matter still pending in the Georgia bankruptcy action was a final approval of the Mortgage Company's claim on its construction loan.

In 1979, Flintridge requested leave of the Georgia court to begin an adversary proceeding in that court against both the Mortgage Company and American Fletcher National Bank for alleged violations of the Bank Holding Company Act, 12 U.S.C. § 1972 (1982), and on pendent state law claims. The bankruptcy court denied Flintridge's request because the Mortgage Company, not the Bank, was the construction lender, the Mortgage Company had not appeared in the bankruptcy court as an agent for the Bank, and the Bank, therefore, had not consented to the summary jurisdiction of the bankruptcy court. Flintridge then filed the identical Bank Holding Company Act action and pendent state law claims in the United States District Court for the Southern District of Indiana. Count one of the complaint was the cause of action under the Bank Holding Company Act, 12 U.S.C. § 1972, wherein the plaintiffs sought treble damages under the Act for alleged violations of the Act's anti-tying provisions. After a review of the facts, which were essentially uncontested, the district court granted the defendants' motion for summary judgment on count one of the complaint. The district court ruled that the financing arrangement between the Mortgage Company and Flintridge, in which the Mortgage Company secured American Fletcher National Bank as its participating lender in the transaction, was a "traditional banking practice" exempt from the anti-tying provisions in the Act. The court also ruled that the Mortgage Company was not a "bank" within the meaning of the Act, and that the conditions in the loan commitment between the Mortgage Company and Flintridge could not constitute violations of the Act.

■ The Bank Holding Company Act was passed "to prohibit anti-competitive practices [by banks] which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." S.Rep. No. 1084, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Ad. News 5519, 5535. By its express terms, however, Section 1972 prohibits only conduct by a "bank." Section 1841(c) provides that a bank is "an institution ... which (1) accepts deposits that the depositor has a right to withdraw on demand, and (2) engages in the business of making commercial loans."

This narrow definition was purposefully provided by Congress, *see* 1970 U.S.Code Cong. & Ad.News 5541, and has been explicitly recognized by the courts. *B.C. Recreational Indus. v. First Nat. Bank,* 1980–2 Trade Cas. (CCH) 63,437, at 76,285 (D.Mass.1980), *aff'd on other ground,* 639 F.2d 828 (1st Cir.1981); *Tose v. First Pennsylvania Bank,* 648 F.2d 879, 898 n. 23 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). The district court found that American Fletcher Mortgage Company is not a bank within the terms of the Act because the Mortgage Company does not accept demand deposits. This fact is fully supported by the record and Flintridge has not contested it. We therefore agree with the district court that the Mortgage Company does not fall within the Act's definition of a

bank and therefore cannot be subject to its anti-tying provisions.

■ Flintridge argues, however, that the Mortgage Company and consequently the Bank should be liable under the Bank Holding Company Act because the Mortgage Company was acting in its dealings with Flintridge as an agent for the Bank. The district court rejected this argument, as did the Georgia bankruptcy court. We agree with this determination.

Admittedly, both the Mortgage Company and the Bank are wholly owned subsidiaries of the American Fletcher Corporation, a national bank holding company located in Indianapolis, Indiana. But this relationship to the same parent corporation is insufficient to establish an agency relationship between the Mortgage Company and the Bank. Just as "[a] parent corporation possesses a separate existence and is treated separately from a subsidiary unless there are circumstances justifying disregard of the corporate entity," *Matter of Chrome Plate, Inc.*, 614 F.2d 990, 996 (5th Cir.), *cert. denied*, 449 U.S. 842, 101 S.Ct. 123, 66 L.Ed.2d 50 (1980), and the "fact of existence of a corporation does not make it the agent of its shareholders" without other evidence of agency, *Frank v. C.I.R.*, 321 F.2d 143, 150 (8th Cir.1963), so also the existence of the Bank and the Mortgage Company as subsidiaries of the same parent corporation does not make them agents for one another without some independent evidence of an agency relationship. Flintridge points to an "Agency and Servicing Agreement" entered between the Bank and the Mortgage Company on June 2, 1969, and cancelled on September 28, 1979, to support its contention that the Mortgage Company was an agent for the Bank when it made its loan commitment to Flintridge in 1976. While this agreement on its face establishes an agency relationship between the Mortgage Company and the Bank for some purposes, it does not follow that the Mortgage Company acts as agent for the Bank for all purposes. It is necessary, therefore, to examine the terms of the "Agency and Servicing Agreement" to determine for what purposes the Mortgage Company is an agent for the Bank.

The Servicing Agreement upon which Flintridge bases its agency argument provides in part:

1. *Origination of Loans.* [Mortgage Company] shall use its best efforts to originate real estate mortgage loans and interim loans and other financing essential to generate real estate mortgage loans for investment by Bank. Bank shall furnish information and advice to [Mortgage Company] from time to time as to the availability of funds for such investments and the desired terms thereof. Nothing herein set forth shall be deemed in any way to grant authority to [Mortgage Company] to bind the Bank to any loan commitment without the Bank's approval or to limit the right of [Mortgage Company] to represent other investors and to generate loans for them.

\* \* \* \* \* \*

4. *Servicing of Mortgage Loans.* [Mortgage Company] shall service all loans originated by it for the benefit of Bank or referred to it for servicing by Bank and in connection therewith shall perform the following duties and services: [detailed listing of ten particular services which the Mortgage Company agrees to perform].

The terms of the Servicing Agreement expressly disclaim any authority on the part of the Mortgage Company to make any loan commitment on behalf of the Bank and recognize that the Mortgage Company has servicing responsibilities for loans beyond those that it handles for the Bank. The servicing of loans for the Bank is not at issue in this case; rather, it is Flintridge's allegation that the Mortgage Company acted as the Bank's agent when it made the commitment agreement. While the Mortgage Company may have later acted as agent for the Bank with respect to the administration of the Bank's participation in the loan agreement between the Mortgage Company and Flintridge, those factors do not establish an agency relationship at the time of the making of the initial

commitment. Moreover, none of these servicing functions which the Mortgage Company undertakes are alleged by Flintridge to be the basis of any claim in the lawsuit.

■ Under Indiana law, " '[a] general agent is one who is authorized to transact all the business of his principal, or all of his business of some particular kind, or at some particular place.' " A special agent on the other hand " 'is one who is authorized to do one or more specific acts, in pursuance of particular instructions or within restrictions necessarily implied from the acts to be done.' " *Farm Bureau Mutual Insurance Company v. Coffin*, 136 Ind. App. 12, 186 N.E.2d 180, 182 (1962).

■ The Servicing Agreement on which Flintridge relies gives the Mortgage Company only a limited agency responsibility to the Bank. If Flintridge wishes to hold the Bank responsible for the terms of the commitment agreement between the Mortgage Company and Flintridge, it must rely upon some additional evidence to do so. While the special agency may be evidence to support a general agency, a special agency alone is insufficient to find agency for all purposes. *Farm Bureau Mutual*, 186 N.E.2d at 182. The district court found, and we agree, that the Servicing Agreement is an insufficient basis upon which to establish a general agency.

Moreover, the history of the practices of the Mortgage Company and its organization as an American Fletcher Corporation subsidiary fully support the district court's finding that the Mortgage Company was acting on its own behalf in its dealings with Flintridge when it made the commitment agreement and not as an agent on behalf of any corporate principal. *McDaniel v. Sage*, 419 N.E.2d 1322, 1323 (Ind.App.1981) (An agency relationship can exist only if the agent is subject to the principal's control with respect to work details.). *See also Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244, 1247 (Ind.App.1984). The loan commitment agreement that is the basis of Flintridge's suit is similar to other loan commitments issued by the Mortgage Company with other banks acting as participating lenders, in which the Mortgage Company acted in its own behalf, subject to no one's control but its own.

The district court discussed at length in its order the operations of the Mortgage Company and how those operations interrelate with the Bank and with other banks in providing financing for construction projects similar to Flintridge's. We think that the district court's findings regarding the operations of the Mortgage Company fully support its conclusion that the Mortgage Company was not an agent of the Bank and that those findings are fully supported by the record. We do think it necessary, however, to summarize briefly the more important aspects of the Mortgage Company's operations.

The Mortgage Company acts as a mortgage banker principally by arranging and servicing commercial real estate development and construction loans, such as the loans made to Flintridge. Although the Mortgage Company usually performs its function by arranging and servicing permanent loans, it also makes interim loans to developers, such as Flintridge, to provide for the acquisition, development, and construction of a proposed project. The Mortgage Company ordinarily conducts extensive evaluation of the project and makes contacts with insurance companies, banks, and other permanent lenders so that there will be permanent financing when the project is completed, and thereby allowing for the interim construction loan to be paid off. Also, the Mortgage Company is interested in finding permanent lenders that will employ the Mortgage Company, for a fee, to service the permanent loan. Income from servicing fees is an important part of the Mortgage Company's financial stability.

In many instances, as in the present case, the Mortgage Company will make the commitment for the construction loan contingent upon its ability to find a satisfactory financial institution to supply the permanent loan. In many instances, the Mortgage Company has the discretion, as the Mortgage Company did here, to divide the

loan with banks, insurance companies, or other financial institutions. That the Mortgage Company retained the discretion here to offer the loan to any participant, whether or not the Bank was the ultimate participant in the permanent loan, further negates the existence of an agency relationship in this case.

The district court also concluded that this arrangement was a traditional banking practice which would exempt the Mortgage Company from the anti-tying provisions of the Bank Holding Company Act. Although we believe there is arguable merit to this holding, we do not need to address that claim here because of our decision that the Mortgage Company is not a "bank" as defined in the Act and that the Mortgage Company was acting on its own behalf in making its loan commitment to Flintridge and not as an agent for American Fletcher National Bank.

## II.  PENDENT STATE CLAIMS

### A.  Interference With Business Relationship

Count two of Flintridge's complaint alleges that the Mortgage Company and the Bank tortiously interfered with Flintridge's business and contractual relationships. Flintridge states that there are three contractual or business relationships with which the defendants allegedly tortiously interfered: Flintridge's contract with Travelers Insurance to provide permanent mortgage financing;[1] its contractual relations with John Walsey, a developer and owner of one of the general partners of the Flintridge Partnership; and its contract with the Stonemont tenants by forcing the tenants to pay their rent directly to the

defendants. The district court, on the defendants' motion for summary judgment, held without discussion that there was no tortious interference with regard to any of the three allegations because "the loan documents authorized and supported said actions." Order of October 31, 1983, at 3.

■ Under Indiana law, to recover for the tort of interference with the contractual relationships of another by inducing a breach of contract,

> five essential elements must be proven: 1) existence of a valid and enforceable contract, 2) the defendant's knowledge of the existence of this contract, 3) the defendant's intentional inducement of a breach of the contract, 4) the absence of justification, and 5) damages resulting from the defendant's wrongful inducement of the breach. *Monarch Indus., Etc. v. Model Coverall Service* (1978), [178] Ind.App. [235], 381 N.E.2d 1098; *Daly v. Nau* (1975), 167 Ind.App. 541, 339 N.E.2d 71.

*Durakool v. Mercury Displacements Industries, Inc.*, 422 N.E.2d 680, 683 (Ind. App.1981). *See also Hurst v. Town of Shelburn*, 422 N.E.2d 322 (Ind.App.1981). Under the tort of interference with a business relationship or prospective advantage in business, the same elements apply except that no contractual relationship need be shown. The plaintiff must prove that a valid business relationship existed, of which the defendant knew, in which the defendant tortiously interfered without justification, and that damage resulted to the plaintiff. *American Fletcher Mortgage Company, Inc. v. U.S. Steel Credit Corp.*, 635 F.2d 1247, 1252 (7th Cir.1980), *cert.*

---

**1.** It is rather curious to note that Flintridge's complaint, filed October 3, 1979, does not mention Flintridge's contrct with Travelers Insurance and does not allege that the defendants caused Flintridge to breach its contract. Defendants' first set of interrogatories specifically requested Flintridge to "[i]dentify each business or contractual relationship of plaintiff which you contend was wrongfully interfered with by any defendant as alleged in paragraph 37 of the complaint." R. 16 (docketed June 26, 1981). Flintridge's response, filed on August 10, 1981,

listed only the Walsey contracts and the leases as the contractual relations with which the defendants allegedly interfered. R. 19. It was not until April 9, 1982, that Flintridge identified, in a supplemental response to defendants' interrogatories, the Travelers' contract. R. 26. Flintridge did not seek then or subsequently to amend its complaint to include the Travelers contract. Since the defendants raise no objection to this oversight by Flintridge, however, we see no reason to detain ourselves on this point.

*denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); *Kiyose v. Trustees of Indiana University,* 166 Ind.App. 34, 333 N.E.2d 886, 891 (1975); *Fort Wayne Cleaners and Dryers Ass'n v. Price,* 127 Ind.App. 13, 137 N.E.2d 738, 742 (1956). The critical element which is at issue here, under whatever cause of action we classify Flintridge's claims, is whether the Mortgage Company actions were unjustifiable, in which case any "interference" is not tortious.

For Flintridge to be successful on its claim that the Mortgage Company's actions were tortious, Flintridge must be able to show that the defendants "acted with the purpose of interfering with the plaintiff's prospective economic advantage." *Crinkley v. Dow Jones & Co.,* 67 Ill. App.3d 869, 24 Ill.Dec. 573, 581, 385 N.E.2d 714, 722 (1979). Although few courts have dealt in depth with the meaning of the term "unjustified," in the sense that it is used here, one court has defined unjustified as a "disinterested malevolence." *Reinforce, Inc., v. Birney,* 308 N.Y. 164, 124 N.E.2d 104, 106 (1954). *Birney* further defined the predicate conduct in terms of "a malicious one unmixed with any other and exclusively directed to injury and damage of another." *Id.* Although *Birney* was a labor case in which the cause of action was one for alleged malicious refusal of a union to permit its members to accept employment offered by Reinforce, Inc., the standards which should be necessary to prove the injury are essentially the same. Both *Birney* and the present case involve claims that the defendants interfered in a relationship to which the plaintiff alleged a right to be free from the defendants' actions. What *Birney* essentially holds is that the existence of a legitimate reason for the defendants' actions will provide the necessary justification to preclude judgment for the plaintiff in the tort action.

Flintridge claims that the Mortgage Company interfered with Flintridge's contract with Travelers Insurance by "refusing to permit" the permanent loan to close at the so-called floor level. Flintridge bases this claim on the Mortgage Company's initiation of foreclosure proceedings in June 1977, and its seeking to decrease John Walsey's role in the Stonemont project. The Mortgage Company, on the other hand, contends that its actions were justified because Flintridge was in default on its loans from the Mortgage Company and because the Mortgage Company felt that Walsey was a substantial reason behind the project's difficulty and that his presence would be a bar to the Mortgage Company granting Flintridge the additional loan commitments that Flintridge sought.

Flintridge argues that because there was disagreement between the parties about whether or not the Mortgage Company's actions were justified and whether the Mortgage Company acted in good faith, a material issue of fact existed which precluded summary judgment on the issue. It is well recognized that summary judgment is proper only if all of the evidence available to the trial court at the time that the motion was made, viewed in the light most favorable to the non-moving party, entitles the movant to judgment as a matter of law. *Dreher v. Sielaff,* 636 F.2d 1141, 1145 n. 4 (7 Cir.1980).

In this case, even when we view the evidence in the record at the time of the Mortgage Company's motion for summary judgment in the light most favorable to Flintridge, there is undeniably a justification for the Mortgage Company's actions. First, Flintridge was continuously in default on its obligations to the Mortgage Company during the latter part of 1976 and during 1977. On June 6, 1977, after Flintridge had failed to pay the mortgage interest on the first of the month as required by the loan agreement, the construction loan matured without payment. At that time, the Mortgage Company was justified in exercising its rights under the loan documents to seek foreclosure. Second, as a condition for granting Flintridge a one million dollar increase in its construction loan, the Mortgage Company requested that Flintridge disassociate itself with John Walsey because the Mortgage Company attributed most of the project's problems to

Walsey. This action was also justified under the circumstances. There is sufficient evidence in the record to support the Mortgage Company's claim that many of the Stonemont project's difficulties were traceable in some manner to Walsey. A lender has a legitimate concern in the management of its borrowers, and consequently in the security of its investments. *Tose v. First Pennsylvania Bank*, 648 F.2d 879, 897–98 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). We therefore hold that the district court was correct in granting summary judgment for the defendants on count two of the complaint.[2]

### B. Breach of Fiduciary Duty and Breach of Contract

■ Flintridge alleged in counts three and four of its complaint that the Mortgage Company's and the Bank actions which have already been described also amount to a breach of fiduciary duty and a breach of the contract between Flintridge and the Mortgage Company. The district court granted summary judgment as to both claims. We agree with this decision.

As the district court stated in its order, nothing that the Mortgage Company did with regard to its contract with Flintridge was not authorized by that loan agreement. None of these documents require the Mortgage Company to undertake fiduciary obligations for Flintridge; thus there can be no breach of any fiduciary obligations. *See, e.g., B.C. Recreational Industries v. First National Bank*, 639 F.2d 828, 833 (1st Cir.1981) ("[I]t would indeed be stretching the definition of fiduciary to hold that a bank, by lending money on a factors lien agreement, owes a fiduciary duty to a borrower."). Nor do we find that any of the Mortgage Company's actions amounted to breach of its very broadly drawn loan commitment with Flintridge.

For the above stated reasons, the order of the district court granting summary judgment on all four of the counts of the complaint in favor of the defendants is affirmed.

AFFIRMED.

---

**2.** The plaintiff also alleged that the defendants interfered with Flintridge's contractual relations with its tenants. We agree with the district court that this claim is without merit as the provisions of the loan commitment letter expressly authorized the assignment of rents to the Mortgage Company.