875 F.2d 1317
 F. Richard WALTON, M.D., Plaintiff-Appellant,
v.
JENNINGS COMMUNITY HOSPITAL, INC., and Louie C. Vaught,
Individually and as Administrator of Jennings
Community Hospital, Inc., Defendants-Appellees.
 No. 88-1613.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 7, 1988.
Decided May 26, 1989.
Rehearing and Rehearing En Banc Denied June 20, 1989.
 
 Richard A. Kemps, Tabbert & Ford, Indianapolis, Ind., for plaintiff-appellant.
 Frederick W. LaCava, Frederick W. LaCava & Associates, Indianapolis, Ind., for defendants-appellees.
 Before CUDAHY and POSNER, Circuit Judges, and GRANT, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 A surgeon, Richard Walton, resigned from the medical staff of Jennings Community Hospital, Inc. ("Jennings") following the initiation of disciplinary proceedings against him. Before leaving, Walton negotiated a settlement agreement with Jennings that specified what the hospital was to say in response to any inquiries regarding Walton's future employment. When Jennings' administrator, Louie Vaught, was subsequently contacted by a hospital interested in employing Walton, Vaught did not abide by the terms of the settlement agreement. Walton has sued the hospital and Vaught for breach of contract and tortious interference with contractual relationship.[1] The district court had jurisdiction by virtue of the diversity of citizenship between Walton, by that time a resident of Iowa, and the defendants, residents of Indiana. The district court granted the defendants summary judgment on all counts. We affirm as to the breach of contract count, but reverse and remand as to the tort claim against the hospital.
 
 I.
 
 2
 Walton joined the staff of Jennings in 1974, and in 1975 was elected to the Board of Directors there. In 1982 the hospital began an investigation of Walton's conduct following allegations that he had sexually harassed a member of the nursing staff. The subsequent investigation turned up allegations of sexual harassment against Walton from three other members of the nursing staff. On July 21, 1982, Vaught (the hospital administrator) wrote Walton informing him that the Executive Committee of the Medical Staff had recommended that Walton be denied any further staff privileges on grounds of unprofessional conduct. Walton then requested an Appellate Review hearing with the hospital Board of Directors.
 
 
 3
 In August, Walton sent a proposed settlement agreement to the hospital, under which Walton would consent to resign in return for the Board's agreement to drop all disciplinary proceedings against him. The settlement agreement also allowed Walton until March 1, 1983, to leave Jennings. On August 27, 1982, the Board of Directors accepted Walton's proposal despite a strong dissent from the Medical Staff, which apparently maintained its recommendation that Walton be forced to leave immediately. The settlement agreement, which was dated September 23, 1982, contained the following terms:
 
 
 4
 1. The Board of Directors of the Hospital will reject any adverse recommendations of the Medical Staff or of any committee thereof or any other agency of the Hospital pending against Dr. Walton as of August 26, 1982, and will conclude any such investigations pending at such time.
 
 
 5
 2. Upon receipt of minutes of the Board of Directors of the Hospital reflecting the action called for in paragraph (1) hereof Dr. Walton will tender his resignation from the Hospital and its staff privileges effective March 1, 1983. The resignation will be accepted effective as of March 1, 1983.
 
 
 6
 3. The Hospital in replying to inquiries in regard to future employment of Dr. Walton will accurately report that Dr. Walton has voluntarily resigned from the Hospital and if asked, and only if asked, will reply that he was not under any investigation as of the date he submitted his resignation.
 
 
 7
 4. A full set of medical tools equivalent in value to those provided to the Hospital by Dr. Walton will be provided to him on his departure at a cost not to exceed $3,000.
 
 
 8
 5. The Hospital will have Dr. Walton replaced as guarantor on the mortgage relating to the Hospital by his successor, subject only to the approval of the FHA. If a full release is not obtainable, a partial one will be obtained to the maximum possible extent.
 
 
 9
 6. Dr. Walton hereby releases the Hospital, its agents, employees, Medical Staff and Board of Directors for all claims relating to the investigation referred to herein and all other matters of any nature prior to August 26, 1982.... Similarly, the Hospital, its agents, employees, Medical Staff and Board of Directors release Dr. Walton from all claims relating to the investigation.... Additionally, the Hospital will agree not to investigate, prosecute or discipline Dr. Walton for any events (i.e. actions by him) occurring before midnight August 26, 1982.
 
 
 10
 Appendix of Appellant at A-1--A-3.
 
 
 11
 By June of 1983 the Kendrick Memorial Hospital ("Kendrick") in Mooresville, Indiana was seriously considering taking Walton onto the staff of the hospital and a related physician's group. As part of Kendrick's review of Walton's credentials, the Kendrick Hospital administrator, Louise Swisher, called Vaught to inquire about Walton's record during his time at Jennings. Swisher's report of what Vaught said is contained in her deposition, in which she states:
 
 
 12
 Mr. Vaught informed me that Doctor Walton had resigned on March the 1st under the direction of the hospital attorney. He did not tell me who the hospital attorney was, and he also told me that Doctor Walton had been indicted by the local jury for Medicaid theft, and that they had had problems in their hospital with Doctor Walton sexually assaulting a nurse and they asked him to resign.
 
 
 13
 Exhibit D to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 19.[2] Approximately four days after this phone conversation, Walton was notified that he would not be allowed to join the Kendrick staffs. Walton eventually found a position at the Gilfillan Clinic in Bloomfield, Iowa. He brought an action against Jennings and its administrator, Vaught, in the District Court for the Southern District of Indiana, and now appeals that court's grant of summary judgment. On appeal Walton raises only the claims against the hospital and Vaught as agent of the hospital; the plaintiff has abandoned his attempts to hold Vaught personally liable for breach of contract or interference with contractual relationship.II.
 
 A.
 
 14
 We first review the procedural stance of the case. Walton initially filed a complaint on November 19, 1984, seeking money damages for breach of contract from Jennings and Vaught. Walton's amended complaint, filed May 7, 1985, sought compensatory and exemplary money damages for breach of contract from Jennings and Vaught. On October 15, 1985, Walton filed a second amended complaint adding a second count seeking damages for interference with contractual relationship from Vaught only. The court gave Walton leave to file his second amended complaint on November 8, 1985.
 
 
 15
 On June 3, 1987, Judge Noland granted defendant Vaught summary judgment on all counts, and defendant Jennings summary judgment as to the breach of contract count. However, the court observed that "[a]lthough the plaintiff has no contractual remedy against Jennings Hospital, he retains the possibility of relief under tort law." Walton v. Jennings Community Hosp., Inc., No. 84 C 1555, mem. op. at 13 (S.D.Ind. June 3, 1987) (Walton I ). The district court stated its disposition as follows: "The Court grants the defendants' motion for summary judgment on Count I (as it pertains to Jennings Hospital) to the extent that it seeks relief pursuant to the law of contracts, and denies defendants' motion for summary [judgment] on Count I (as it pertains to Jennings Hospital) on principles of tort law." Id. at 14. As we have noted, Count I stated a breach of contract claim. In August of 1987, Judge Noland denied the plaintiff's request for trial by jury because it was untimely.
 
 
 16
 The case was then transferred to Judge McKinney. In February of 1988, Judge McKinney denied Walton's motion for reconsideration of the court's previous grant of partial summary judgment to defendants. At the same time Judge McKinney denied the plaintiff's motion for leave to file yet another amended complaint. Walton v. Jennings Community Hosp., Inc., No. 84 C 1555 (S.D.Ind. Feb. 29, 1988) (Walton II ). Judge McKinney's opinion also granted defendants' motion for summary judgment as to the plaintiff's tort claims against the hospital, relying entirely upon this court's decision in Flintridge Station Associates v. American Fletcher Mortgage Co., 761 F.2d 434 (7th Cir.1985).
 
 
 17
 The two district court decisions leave the case in a somewhat unusual stance. Judge Noland's opinion left open only a cause of action not pleaded by Walton. Judge McKinney then denied the plaintiff's motion to amend the pleadings to include that cause of action (along with numerous other new causes of action), but simultaneously ruled on the merits of the unpleaded claim (granting Jennings summary judgment on the merits of the tort claim against it). The most sensible reading of the situation is to understand Judge McKinney's denial of Walton's motion (for leave to file a new amended complaint) as a refusal to consider the many completely new causes of action that Walton sought to introduce. The proposed amended complaint would have added to the original breach of contract and tort counts new counts for civil conspiracy, section 1983 and section 1985 violations and violation of the Indiana Peer Review Act. Judge McKinney understandably denied Walton's motion, which came more than eight months after Judge Noland's original ruling, two months after the trial date had to be continued due to Walton's "last minute" filing of a witness list and nine days prior to the new scheduled trial date. Walton II, mem. op. at 3. However, because Judge Noland and Judge McKinney both viewed the tort claim against the hospital as viable, and because all of the parties squarely addressed the claim in briefs filed after Judge Noland's decision, the complaint was constructively amended to include the tort claim against the hospital.[3]
 
 
 18
 We review here Judge Noland's partial grant of summary judgment, Judge McKinney's grant of summary judgment as to the remaining tort claim and Judge Noland's denial of Walton's jury trial request.
 
 B.
 
 19
 In Walton I, Judge Noland granted the defendants summary judgment as to the breach of contract count, ruling that the contract between Walton and Jennings Community Hospital was void because it violated the public policy enunciated in the Indiana Peer Review Act. I.C. Sec. 34-4-12.6-1, et seq.[4] This court has previously considered the Indiana peer review provisions and characterized the policy underlying the statutory scheme as follows:The State of Indiana has developed and enacted a comprehensive statutory scheme of medical peer review to protect consumer welfare. Indeed, the State's medical peer review process ensures Indiana citizens of the highest quality of medical care, while protecting them from incompetent, unqualified medical treatment.
 
 
 20
 Marrese v. Interqual, Inc., 748 F.2d 373, 387 (7th Cir.1984). The Peer Review Act is an integral part of the statutory framework, designed to guarantee that peer review committees have access to full and frank assessments of applicants for positions on medical staffs. See Terre Haute Regional Hosp., Inc. v. Basden, 524 N.E.2d 1306, 1311 (Ind.Ct.App. 1st Dist.1988) (information given to peer review committee privileged under Peer Review Act in order "to foster an effective review of medical care;" effective review requires that all participants "communicate candidly, objectively, and conscientiously"); King v. Bartholomew County Hosp., 476 N.E.2d 877, 880 (Ind.Ct.App. 1st Dist.1985) (immunity granted under Peer Review Act "is intended to be a justifiable means in providing a complete, candid, up-to-date professional history of the applicants").
 
 
 21
 The contract between Walton and Jennings would, at the very least, have discouraged Jennings from freely communicating to prospective employers any negative evaluations of Walton's professional conduct. Indeed, it affirmatively required Jennings to give out information which, standing alone, was actually misleading. The contract required Jennings to say that Walton had voluntarily resigned from the hospital and was not under investigation as of the date he submitted his resignation. However, Walton was under investigation shortly before that date, and the hospital's Executive Committee had decided to recommend withdrawal of Walton's staff privileges before Walton "voluntarily" resigned. Thus the information that Jennings was required under the contract to give out would surely have given prospective employers a mistaken impression of the circumstances surrounding Walton's departure. Had the contract required Jennings to give the whole story, including both the fact that allegations had been made regarding Walton's conduct and the fact that Walton had steadfastly denied all charges against him, the contract count might have stood. But the contract between Walton and Jennings required Jennings to paint a misleading picture for Walton's prospective employers, and thus violated Indiana's express public policy in favor of full disclosure to peer review committees.[5]
 
 
 22
 Indiana generally does not enforce contracts that are "contrary to public policy." Kaszuba v. Zientara, 506 N.E.2d 1, 2 (Ind.1987); see also Swain v. Bussell, 10 Ind. 438 (1858); Sumner v. Union Trust Co. of Indianapolis, 116 Ind.App. 684, 66 N.E.2d 621 (1946). Where the public policy violated by a contract is expressed in a statute designed "for protection of the public health, safety, and welfare," courts are more likely to void the contract. Noble v. Alis, 474 N.E.2d 109, 111 (Ind.Ct.App. 1st Dist.1985) (where statute expresses policy designed to protect public, " 'it is more likely that the statute breaker will be denied the enforcement of his bargain' ") (quoting Wilson v. Kealakekua Ranch, Ltd., 57 Hawaii 124, 551 P.2d 525 (1976)). The Indiana Peer Review Act is clearly a statute designed to protect public health by ensuring that medical staffs have full information in their hiring decisions. The contract at issue in the case before us violates the public policy expressed in the Peer Review Act and is therefore unenforceable.[6]
 
 C.
 
 23
 In Walton II, Judge McKinney granted the defendants' motion for summary judgment on plaintiff's claim of tortious interference with contract or prospective business advantage. Judge McKinney reasoned that under our opinion in Flintridge, Walton could not succeed, because "the existence of a legitimate reason for the defendant's actions will provide the necessary justification to preclude judgment for the plaintiff in [a] tort action." Flintridge, 761 F.2d at 441. Judge McKinney somewhat cryptically concluded that because the previous district court ruling had "found that the defendants' conduct here was justified under the Peer Review Act and as a matter of public policy," Walton could not as a matter of law succeed with his tort claim against the hospital. Walton II, mem. op. at 5.
 
 
 24
 In Flintridge, a mortgage company initiated foreclosure proceedings against the plaintiff, Flintridge Station Associates ("Flintridge"), because Flintridge was in default on its loans. The mortgage company also refused to give the plaintiff additional loan commitments unless Flintridge disassociated itself from one of its developers, John Walsey, whom the mortgage company viewed as a key source of the difficulties that had developed over the project. Flintridge subsequently sued the mortgage company on a number of counts, including one for tortious interference with a business relationship. In an attempt to resist the defendants' motion for summary judgment, Flintridge urged that whether or not the mortgage company had acted in good faith was a disputed material issue of fact. This court held that there was undeniably a good justification for the mortgage company's actions in refusing further loan commitments and foreclosing on existing loans (because Flintridge was in default on existing loans, a fact neither party contested). The existence of this uncontested legitimate reason for the mortgage company's action provided "the necessary justification to preclude judgment for the plaintiff in the tort action," regardless of any possible mixed motive for the company's actions. Flintridge, 761 F.2d at 441.
 
 
 25
 Judge McKinney apparently concluded that because it was undisputed that the Peer Review Act provided a justification for any good faith, honest communications to peer review committees, Walton could not succeed in the tort action. However, in ruling that the contract between Walton and Jennings violated Indiana public policy, Judge Noland never had to reach the question whether the particular communication in question here was justified. This is presumably why he left the tort count against the hospital standing. We do not know whether the communication in question here was the kind of communication envisioned by the Peer Review Act, and so we do not know whether there was a justification for Vaught's remarks.
 
 
 26
 In Flintridge the issue was whether a mixed or negative motive would render suspect a clearly justified action. But in this case we do not know whether the action in question was justified in the first instance, because a dispute remains over whether Vaught spoke the truth to Swisher. If the statements were truthful, then Vaught's action was a justified transmission of information to a hospital peer review committee in accordance with Indiana public policy. If, however, the statements were untruthful, they were clearly without justification. Vaught apparently told Swisher that Walton had resigned "under the direction of the hospital attorney" and that Jennings had had "problems with Doctor Walton sexually assaulting a nurse and they asked him to resign." Walton has not conceded the truth of these statements, so that a material issue of fact remains disputed. Neither we nor the district court may appropriately resolve this issue on a motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Brock v. American Postal Workers Union, 815 F.2d 466 (7th Cir.1987). We therefore reverse and remand the tort action against the hospital.
 
 D.
 
 27
 Finally, Walton appeals the district court's refusal to grant his motion for a jury trial and his motion for leave to amend the pleadings, both untimely made. The district court acted well within its discretion in denying both motions. Walton's clearly untimely request for a jury trial came more than 2 1/2 years after the commencement of the action after extensive discovery conducted in anticipation of a bench trial. The request to amend the pleadings a third time to include numerous new causes of action came more than five months after the jury trial request--and only nine days before the scheduled trial date. We affirm the district court's denial of both motions.
 
 III.
 
 28
 Because the contract between Walton and Jennings violated Indiana public policy, Walton cannot maintain his breach of contract action against the defendants. However, his action for interference with contract remains viable, because a material issue of fact is in dispute. His motions for a jury trial and for leave to amend the pleadings a third time were properly denied.
 
 
 29
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 As noted below, we treat the complaint as constructively amended to include the tortious interference claim against the hospital although the plaintiff's complaint as formally amended only included a tort claim against Vaught. However, the first district court decision by Judge Noland preserved the action as a tort claim against the hospital, and both parties had an opportunity to present their arguments on that issue before the second district court ruling by Judge McKinney, which granted the defendants summary judgment as to that claim. The complaint has therefore been constructively amended to include the tort claim as against the hospital
 
 
 [2]
 Swisher's notes from the phone call corroborate her account
 They read, in part:
 "Dr. Walton, Jennings Community Hospital ...
 Resigned March 1st
 Directed by Hosp. attny.
 Indicted by local Jury
 Medicaid Theft--
 Adm.--Mr. Lou Vaught
 Dr. Walton
 Had to withdraw
 Sexual assault on
 May 7, 1982
 Dr. Walton asked to Resign
 May 10, '82
 
 
 [3]
 This is in keeping with Rule 15(b) of the Federal Rules of Civil Procedure, which allows great latitude in amending complaints to conform with subsequent changes as the case develops: "Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues." The pleadings may be amended over the objection of another party, unless the objecting party can show that the introduction of evidence pertinent to issues not introduced in the pleadings would in some way prejudice his or her case. Fed.R.Civ.P. 15(b). When issues that were not raised in the pleadings "are tried by express or implied consent of the parties," this consent acts to permit what is in effect a constructive amendment of the pleadings to include those issues. See, e.g., In re Prescott, 805 F.2d 719, 725 (7th Cir.1986); see also C. Wright & A. Miller, Federal Practice and Procedure Sec. 1493 (1971). The case before us presents an interesting twist; the pleadings were constructively amended by the first district court judge's opinion, without any formal motion from the parties, who consented by implication when they proceeded to prepare for trial on the new issue. The new issue was most certainly before the second district court judge, by which time no prejudice could have resulted to either party because both had had an opportunity to present their arguments to the second judge. Although it is the judge rather than the parties who introduced the amendment, and although the amendment was effected during consideration of a motion for summary judgment rather than at trial, it is fully consonant with the spirit of Rule 15(b) and existing case law to view the pleadings as constructively amended here. See Baker v. Chicago Fire & Burglary Detection, Inc., 489 F.2d 953 (7th Cir.1973) (no reversal on sole ground that defendant failed to plead affirmative defense where "plaintiff does not appear to have been unfairly disadvantaged" by this failure) (dictum); National Dairymen Ass'n v. Dean Milk Co., 183 F.2d 349 (7th Cir.1950) (pleading considered to be amended to conform with issues tried and decided but not mentioned in complaint); Sears, Sucsy & Co. v. Insurance Co. of North America, 396 F.Supp. 820 (N.D.Ill.1975) (in granting summary judgment, court deems pleadings amended to conform to submitted material where no prejudice results); see also Karlen v. Ray E. Friedman & Co. Commodities, 688 F.2d 1193 (8th Cir.1982) (trial judge did not err in instructing jury on theory not raised in pleadings but tried and argued); Dunn v. Trans World Airlines, Inc., 589 F.2d 408 (9th Cir.1979) (pleadings may be amended even at appellate level; failure to formally amend pleadings to conform to proof at trial does not preclude recovery on judgment); Ellis v. Arkansas Louisiana Gas Co., 609 F.2d 436 (10th Cir.), cert. denied, 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 239 (1979) (district court did not abuse discretion in deciding case on basis of issue not pleaded where parties had notice that issue was pertinent); Brown v. Ward, 438 F.2d 1285 (4th Cir.1970) (no reversible error where plaintiff recovers on theory not presented in pleadings; pleadings deemed amended even after verdict)
 
 
 [4]
 The Indiana Peer Review Act is comprised primarily of confidentiality and immunity provisions:
 Section 2. Confidentiality and Privilege.
 (a) All proceedings of a Peer Review Committee shall be confidential and all communications to a Peer Review Committee shall be privileged communications to the Peer Review Committee. Neither the personnel of a Peer Review Committee nor any participant in a proceeding therein shall reveal any content of communications to, or the records or determinations of, a Peer Review Committee outside the Peer Committee [and] except as otherwise provided in this chapter, no person who was in attendance at any such Peer Review Committee proceedings shall be permitted or required to disclose any information required in connection with or in the course of such proceeding, or to disclose any opinion, recommendation or evaluation of the Committee or of any member thereof. Information otherwise discoverable or admissible from original sources is not to be construed as immune from discovery or use in any proceeding merely because it was presented during proceedings before such Peer Review Committee, nor is a member, employee, or agent of such committee or other person appearing before it to be prevented from testifying as to matters within his knowledge and in accordance with the other provisions of this chapter, but the said witness cannot be questioned about this testimony or other proceedings before such committee or about opinions formed by him as a result of said committee hearings.
 (b) Any professional health care provider under investigation shall be permitted at any time to see any records accumulated by a Peer Review Committee pertaining to his personal practice and shall be offered the opportunity to appear before the Peer Review Committee with adequate representation to hear all charges and findings concerning his practice and to offer rebuttal information, which shall be a part of the record before any disclosure of the charges and findings hereunder. Communications to, and the records and determinations of, a Peer Review Committee may only be disclosed to the specific credentials committee of a hospital or other health care facility, the disciplinary authority of the professional organization of which the professional health care provider under question is a member, or the appropriate state board of registration and licensure which the committee deems necessary for recommended disciplinary action, and shall otherwise be kept confidential for use only within the scope of the committee's work.
 Section 3. Immunity.
 (a) There shall be no liability on the part of, and no action of any nature shall arise against, the personnel of a peer review committee for any act, statement made in the confines of the committee, or proceeding thereof made in good faith in regard to evaluation of patient care as that term is defined and limited in section 1(b) of this chapter.
 (b) Persons or organizations, including peer review committees, who, in good faith, furnish records, information or assistance to a peer review committee, in regard to evaluation of qualifications of professional health care providers, or of patient care as that term is defined and limited in section 1(b) of this chapter, shall be immune from any civil action arising from such acts.
 
 
 [5]
 Walton urges that in addition to promoting a policy of protecting the public by ensuring a high standard of medical care, the Peer Review Act expresses a policy of protecting the due process rights of physicians undergoing peer review. Walton urges that this countervailing policy consideration is evident in provisions ensuring the confidentiality of peer review proceedings, and permitting the physician under investigation access to any peer review committee records. I.C. 34-4-12.6-2 (1980). Of course, these same confidentiality provisions also serve the overriding policy concern of the statute--to ensure that peer review committees have access to frank and honest information. But it is true that the statute also takes steps to protect health care providers' due process rights. However, that the statute may evince several policy concerns does not rescue the contract at issue here, because the contract does not promote protection of Walton's due process rights as envisioned in the statute either. The contract does not, for example, secure to Walton access to information or additional hearings. Instead it blocks access to information. While such a complete block of information may indeed protect Walton from damage to his reputation, the contract goes far beyond the more limited due process protections guaranteed by the Peer Review statute and furthermore actively interferes with the statute's underlying purpose. See Marrese, 748 F.2d at 387, 392; see also Calhoun, Public Policy and Antitrust Enforcement in the Health Care Industry, 19 Ind.L.Rev. 55, 65 (1986). Walton had the opportunity to exercise the procedural rights granted him under Indiana law, but declined to appeal his case further. No critical due process principles are violated by voiding the contract in this case
 
 
 [6]
 To clarify a potentially confusing point, the contract here is void because it violates the public policy expressed in an Indiana statute; the contract does not necessarily violate the terms of the statute itself. This is a distinction recognized by the Indiana Supreme Court in Kaszuba v. Zientara, when it noted that "Indiana courts have generally refused to enforce contracts that are illegal or contrary to public policy." 506 N.E.2d at 2 (emphasis added). Arguments about whether the contract in question was specifically forbidden by the Peer Review Act, or whether the communications in question did or did not violate the express provisions of the Act are therefore irrelevant. Walton may be correct in asserting that Vaught did not communicate with Swisher in "good faith," and that Vaught cannot for this reason invoke the Peer Review Act immunity provision. But Walton is not suing Vaught or Jennings for violating the Act, and the question before us is not whether specific provisions of the Act were violated. Rather, the issue is whether the contract at issue here contravened the public policy of Indiana as expressed in the Peer Review Act