NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. AZ-11-1091-PaDJu and |
| | AZ-11-1092-PaDJu |
| DEED AND NOTE TRADERS, LLC, | (Consolidated) |
| Debtor. | Bk. No. 10-03640 |
| _____ | |
| PNC MORTGAGE; BAC HOME LOANS | |
| SERVICING, LP, fka | |
| Countrywide Home Loans | |
| Servicing, L.P.; U.S. BANK, | |
| N.A.; AMERICA'S SERVICING | |
| COMPANY; WELLS FARGO BANK, | |
| N.A.; FLAGSTAR BANK, FSB; | |
| CHASE HOME FINANCE, LLC; THE | |
| BANK OF NEW YORK MELLON, fka | |
| The Bank of New York; DEUTSCHE | |
| BANK NATIONAL TRUST COMPANY; | |
| LITTON LOAN SERVICES; | |
| CITIBANK, N.A.; ONEWEST BANK, | |
| FSB; AURORA LOAN SERVICES, | |
| LLC; HSB MORTGAGE SERVICES; | |
| HSBC BANK USA, N.A., | |
| Appellants, | |
| v. | **M E M O R A N D U M**[1] |
| DEED AND NOTE TRADERS, LLC, | |
| Appellee. | |
| _____ | |

Argued and Submitted on February 24, 2012
at Phoenix, Arizona

Filed - April 5, 2012

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Eileen W. Hollowell, Bankruptcy Judge, Presiding

_____

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Appearances:     David W. Cowles of Tiffany & Bosco, P.A. argued for Appellants Wells Fargo Bank, N.A., Chase Home Finance, LLC, Litton Loan Services, Deutsche Bank National Trust Company, U.S. Bank National Association, BAC Home Loans Servicing, LP, America's Servicing Company, PNC Mortgage, Flagstar Bank, FSB and The Bank of New York Mellon.  Jessica R. Kenney of McCarthy, Holthus & Levine argued for Appellant Aurora Loan Services, LLC.  Scott D. Gibson of Gibson, Nakamura & Green, PLLC argued for Appellee Deed and Note Traders, LLC.

Before: PAPPAS, DUNN and JURY, Bankruptcy Judges.

Appellants appeal the order of the bankruptcy court confirming the chapter 11[2] plan of reorganization filed in this case by debtor Deed & Note Traders, LLC ("DNT").  We AFFIRM.

**FACTS**

DNT is an Arizona limited liability company that was formed in 1993.  Since then, it has engaged in the real estate business in Tucson, Arizona, purchasing, rehabilitating, leasing and selling residential properties.  DNT is wholly owned by the Kinas Family Trust, and David Kinas ("Kinas") is the principal manager.

DNT financed the acquisition of its properties using its own operating income and through the many loans it obtained from individual investors.  These were generally short-term, high interest loans.  It was DNT's business practice to hold a

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

property for about a year, during which time it would rehabilitate the property, and then refinance the loan with traditional lenders at market rates. As property values increased, DNT would also sell property in its inventory at a profit.

In December 2006, the Arizona attorney general investigated the business practices of DNT and, after lengthy negotiations, DNT and the state entered into a Consent Agreement. Under the terms of the agreement, DNT was obliged to sell a number of houses back to their original owners and "agreed to pay a large sum as and for attorney fees incurred by the state." These payments and transactions occurred at the beginning of a declining real estate market and, according to DNT, practically eliminated any operating reserves previously held by DNT. DNT's financial problems were exacerbated in August 2007 when First Magnus Financial Corporation, a large provider of traditional and other residential loan programs in Arizona, shut down and filed for bankruptcy.

### DNT's First Bankruptcy Case

The combination of fines, the loss of funding sources for buyers from DNT's inventory, and the corresponding loss of sales revenue caused DNT to file its first petition for protection under chapter 11 on September 7, 2007. On September 20, 2007, DNT filed its schedules in which it listed a total of $40,581,976.00 in real property assets and $29,807,073.00 in secured claims against those properties. The total unsecured debt was $706,208.12, most of which was debt held by insiders and the secured creditors.

DNT filed its plan and disclosure statement on December 26, 2007; the plan was amended on April 24 and May 22, 2008. We refer to the twice-amended plan as the "First Plan." All claims of the appellants in this appeal were classified as Class 4 Secured Claims in the First Plan. These claims were to be treated as follows:

- All claimants would retain their respective security interests on the properties securing their claims.

- The arrears on these claims, together with accrued unpaid interest at the contract rate, were added to the principal balance on the secured debts as of the effective date of the plan. This amount (i.e., the arrears plus the unpaid principal balance) was the new "outstanding balance" on the secured creditors' claims.

- The claimants would receive monthly deferred interest-only payments on the outstanding balance. The interest accruing on the outstanding balance was based on the published 30-year residential mortgage rate for the Tucson area provided on the internet website, bankrate.com, from and after the effective date.

- The claims would be paid in full by DNT, either at the time of sale of the secured property or upon refinancing the obligation, or on or before a stated maturity date. The maturity date for first-priority liens was the seventh anniversary of the effective date; the maturity date for any junior liens was the fifth anniversary.

On September 16, 2008, DNT reported to the bankruptcy court that all objections to the First Plan had been resolved by

stipulation. The bankruptcy court entered an order confirming the First Plan on October 23, 2008. The effective date was November 3, 2008.

In the year after the effective date, there were almost a hundred motions for relief from stay, notices of default, or associated pleadings filed by secured creditors alleging DNT's failure to make monthly payments under the First Plan. Many of these motions were granted. However, the record contains no information regarding foreclosures or other actions taken by the Class 4 Secured Creditors.

On March 9, 2009, DNT filed a motion for entry of a Final Decree and Order Closing Case in the bankruptcy case. Three creditors who are not involved in this appeal (the "Cherry Group") filed objections to the entry of final decree, arguing that DNT had failed to make payments under the First Plan and other irregularities. On May 4, 2009, the Cherry Group filed a motion asking the bankruptcy court to revoke the order confirming the First Plan on generally the same grounds as their objections to final decree. The bankruptcy court ordered that the motion to revoke and DNT's motion for a final decree be considered at a hearing on September 2, 2009.

At that hearing, counsel for DNT and the Cherry Group jointly informed the bankruptcy court that the Cherry Group was withdrawing the motion to revoke the confirmation order and the objections to entry of a final decree. DNT represented that it would prepare the order for the final decree.

Before entry of any final decree, appellant Wells Fargo, N.A., moved to convert the bankruptcy case to a chapter 7 case on

November 11, 2009. Wells Fargo alleged, inter alia, that there had been mismanagement of estate funds by DNT and diversion of assets to insiders, and that DNT's actions constituted a material default under the First Plan. After multiple continuances, the bankruptcy court held a hearing on the motion to convert on January 5, 2010. Again, at the hearing, counsel for the parties informed the court that the issues had been resolved. A joint stipulation withdrawing the motion to convert was entered on February 5, and approved by the bankruptcy court on February 8, 2010. As all objections and impediments to entry of a final decree had been overcome, on February 8, 2010, the bankruptcy court also entered the final decree and order closing the case.

## DNT's Second Bankruptcy Case

Only four days after entry of the final decree and order closing the case in the first bankruptcy case, on February 12, 2010, DNT filed a second chapter 11 petition. DNT's schedules, filed on March 16, 2010, list $19,858,452.00 in real property assets and $27,085,119.94 in secured claims on those properties. Total unsecured debt was $591,935.88.

DNT proposed a plan of reorganization in the second bankruptcy case on April 2, 2010 (the "Second Plan"). The only significant difference between the First and Second Plans, as the parties have acknowledged in this appeal, was DNT's proposal to reduce the Class 4 Secured Creditors' allowed claims to the "market value" of the properties securing those claims as of the effective date of the plan. In other words, the Second Plan

proposed to "cramdown"[3] these claims.

The Appellants, each holding loans secured by separate properties, filed ten motions to dismiss the second bankruptcy case on May 21, 2010. These motions argued in identical language that DNT's Second Plan violated § 1127(b), and the principle of finality of orders, and that DNT was attempting to circumvent the prohibition on modification of a confirmed, substantially consummated plan by a subsequent chapter 11 case.

In addition to the dismissal motions, over the next few months, over sixty objections to confirmation of the Second Plan were filed by creditors, including all of the Appellants. These objections to confirmation generally parroted the arguments made by the Appellants in the motions to dismiss.

The bankruptcy court held several hearings on the motions to dismiss and confirmation of the Second Plan, beginning in August, and culminating on December 22, 2010.[4] Before the December 22 hearing, DNT had submitted a unilateral offer to amend the plan so as to not cramdown on six of the ten loans involved in the motions to dismiss, and either to abandon those properties or consent to relief from stay in favor of the secured creditor. As to the remaining four loans and properties

---

[3] "Cramdown" is a bankruptcy term of art referring to a proposal to confirm a reorganization plan without the consent, and frequently over the objection, of the secured creditors. See Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 50 (9th Cir. BAP 2008).

[4] For reasons unknown, the transcript of the December 22, 2010 hearing is the only one provided by the parties to the Panel in the excerpts of record or docket.

-7-

pertaining to creditors filing motions, DNT indicated its position that the properties were worth more than the amount of the respective debts secured by them, such that the creditors' rights were thus not impaired under the Second Plan.

At the hearing, after counsel were heard, the bankruptcy court denied the motions to dismiss the bankruptcy case, concluding that, as the result of DNT's amendment, none of the secured creditors were impaired under the Second Plan. The denial of these motions to dismiss was not appealed.

The bankruptcy court then conducted an evidentiary hearing on plan confirmation. The court heard testimony from Kinas regarding his management of DNT, why DNT failed to meet its obligations under the First Plan, and the requirements for confirmation of the Second Plan. Kinas was then cross-examined by attorneys for various creditors. After hearing the testimony and closing arguments of counsel, the bankruptcy court overruled the objections to confirmation and confirmed the Second Plan.

In its oral decision, the bankruptcy court first observed that, in its earlier ruling denying the motions to dismiss, it had not commented on the focus of the secured creditors' argument, that DNT was attempting to violate § 1127(b). The bankruptcy court rejected this argument and found that DNT was not attempting to thwart the First Plan's treatment of over-secured creditors because the Second Plan treated them no differently. Simply put, as to over-secured creditors, the court concluded that they were not significantly impaired under either Plan, and that DNT had not violated § 1127(b) and the principle of finality of confirmation orders regarding those creditors.

-8-

As the court then observed, DNT's proposed cramdown of the claims of under-secured creditors was a different matter:

> A more difficult call is for the properties and the creditors secured by those properties who were not crammed down in the first case and are being crammed down in the second case, all of the arguments about 1127 and 1141 clearly the debtor here is seeking a modification of the terms of the first plan. The question is – is it justifiable[?] Is it justifiable? And if it's justifiable, is the treatment being offered to these creditors in good faith? That it seems to me is the crux of the difficult decision here. I look at this under the totality of the circumstances test, I believe, for good faith. So the plan terms are short basically. This is not an extended period of time of a stretch out. The interest rate isn't being modified from the first plan. Those are good things. It's the cramdown itself which is the essence of the problem. But unlike the few cases I've been able to find on this, I'm not sure this is a situation where all of the burden is being shifted to the secured creditors because, in fact, all they were ever going to get is the value of the property because of the nature of the anti-deficiency statute in Arizona. I believe that the debtor has met its burden here, but I would say it's a very, very close call.

The bankruptcy court decided that the Second Plan should be confirmed, and the objections to confirmation overruled. It entered an order confirming the Second Plan on February 10, 2011. Appellants filed a timely appeal on February 24, 2011.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Whether the bankruptcy court abused its discretion in confirming the Second Plan.

Whether the bankruptcy court clearly erred in determining that the Second Plan was filed in good faith as required under

-9-

§ 1129(a)(3).

## STANDARDS OF REVIEW

While a bankruptcy court's decision to confirm a chapter 11 plan is reviewed for an abuse of discretion, its determination that the plan satisfies the confirmation requirements necessarily requires the bankruptcy court to make factual findings, which are reviewed under a clear error standard. Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1358 (9th Cir. 1986); Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 184 (9th Cir. BAP 2003).

Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been committed. In re Brotby, 303 B.R. at 184.

In applying an abuse of discretion test, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If the bankruptcy court identified the correct legal rule, we then determine whether its "application of the correct legal standard [to the facts] was (1) illogical, (2)implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the bankruptcy court has abused its discretion. Id.

## DISCUSSION

**I. Appellants have standing because at least one of the appellants, Wells Fargo, is aggrieved.**

As a preliminary matter, DNT argues that the Appellants lack standing to appeal the bankruptcy court's order. DNT appears to argue that because the Appellants filed the motions to dismiss as the vehicle for arguing that §§ 1127(b) and 1129(a)(3) prohibit the bankruptcy court from confirming a second plan that modifies the terms of a confirmed plan, and since the bankruptcy court, in denying those motions, ruled that the Appellants were not impaired under the terms of the Second Plan, therefore any provisions in the Second Plan modifying the rights of secured creditors did not apply to the Appellants. We disagree with DNT that the Second Plan did not impair the rights of any of the Appellants.

In the Ninth Circuit, a party has standing to appeal a bankruptcy court order if the party is "aggrieved" by the order. In re Commercial W. Fin. Corp., 761 F.2d 441, 443 (9th Cir. 1985). An appellant is aggrieved if "directly and adversely affected pecuniarily by an order of the bankruptcy court"; in other words, the order must diminish the appellant's property, increase its burdens, or detrimentally affect its rights. Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.), 177 F.3d 774, 777 (9th Cir. 1999) (quoting Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 442 (9th Cir. 1983)).

In this appeal, it cannot be seriously disputed that DNT is attempting a cramdown of the Appellants' secured claims. Simply put, through the Second Plan, DNT is attempting to restructure

-11-

the rights granted to some of the Appellants through the First Plan and to reduce the amount of secured debt it will pay to some of them. In this sense, DNT is unquestionably attempting to "detrimentally affect the rights" of some of the secured creditors. As a result, the Appellants whose claims are to be restructured have standing to appeal confirmation of DNT's Second Plan.

Moreover, even if one or more of the individual appellants arguably lack standing to appeal, there is at least one creditor that did not file a motion to dismiss, yet filed an objection to confirmation and that holds a claim targeted in the Second Plan for cramdown. Wells Fargo holds a claim secured by a lien on the DNT property located on North Orchard Street in Tucson. Wells Fargo did not file a motion to dismiss, but it did object to confirmation of the Second Plan on August 6, 2010. According to the appendix to the declaration of Kinas submitted by DNT in support of plan confirmation on December 22, 2010, the current balance due on the Wells Fargo loan on the North Orchard property was $82,317.88, and current market value of the property was $70,000. In the Second Plan, DNT proposed to cramdown the Wells Fargo secured claim to $70,000. Unlike claims secured by other properties involved in the motions to dismiss, DNT did not make any offer to abandon, or to consent to relief from stay, on that property. Put another way, Wells Fargo's rights were detrimentally affected, or in other words, it was "aggrieved," when the bankruptcy court confirmed the Second Plan.

If one appellant has standing, there is no need to examine the standing of the other appellants. <u>Carey v. Population</u>

<u>Servs., Int'l</u>, 431 U.S. 678, 682 (1977) (holding that if one party has the requisite standing to appeal, the appellate court "has no occasion to decide the standing of the other appellees."); <u>W. Watersheds Project v. Kraayenbrink</u>, 632 F.3d 472, 485 (9th Cir. 2011) (same).  We therefore decline to entertain DNT's objection to the Appellants' standing to appeal.

**II.  The bankruptcy court did not clearly err in determining that extraordinary and unforseen circumstances were present in this case which justified DNT's proposal to cramdown secured claims in the Second Plan.**

The Code makes clear that a debtor's right to modify a confirmed chapter 11 plan is subject to conditions.  The appellants have maintained, both in the bankruptcy court and on appeal, that § 1127(b)[5] prohibits DNT's confirmation of a chapter 11 plan proposing to change the terms of the treatment of their claims under the substantially consummated First Plan. While case law unquestionably allows debtors to engage in serial filings of chapter 11 cases, what is in dispute here is the sort of justification required before a bankruptcy court should

---

[5] **§ 1127.  Modification of plan.**

* * *

(b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

endorse a debtor's second plan proposing to modify the terms of a prior, confirmed and substantially consummated plan.

The only two courts of appeals to examine this question hold that serial chapter 11 filings are not per se impermissible. In Fruehauf Corp. v. Jartran (In re Jartran), the Seventh Circuit observed that,

> there is no prohibition of serial good faith Chapter 11 filings in the Code — indeed, there is not even a time limit on successive filings parallel to that imposed on individuals or family farmers. 11 U.S.C. § 109(g). As the district court noted, Congress could easily have included repeat corporate debtors in that section; its failure to do so indicates that corporate debtors are exempt from even the minimal constraints on serial filings imposed on other kinds of debtors.

886 F.2d 859, 869-70 (7th Cir. 1989). The court addressed another serial chapter 11 case in In re Official Comm. of Unsecured Creditors, 943 F.2d 752, 757 (7th Cir. 1991). Although both of these cases painted the authority to file serial chapter 11's with broad brush strokes, neither provided clear guidance on whether, and to what extent, the plan proposed in the second chapter 11 case could modify creditor treatment in the first plan.

Following shortly after the Seventh Circuit decisions, the Fifth Circuit decided In re Elmwood Dev. Corp., 964 F.2d 508, 511 (5th Cir. 1992). As described by the court,

> This case raises for this circuit the de novo issue of the extent to which a serial filing of a Chapter 11 petition evidences a lack of good faith on the part of the debtor. We conclude that the mere fact that a debtor has previously petitioned for bankruptcy relief does not render a subsequent Chapter 11 petition "per se" invalid. This conclusion is consistent with the Supreme Court's recent teaching in Johnson v. Home State Bank [111 S.Ct. 2150 (1991)]. The Johnson Court held that serial Chapter 7 and Chapter 13 petitions are not categorically prohibited. The Court reasoned

-14-

that because Congress has enumerated certain instances in which serial filings are per se impermissible, there is no absolute prohibition in instances not so enumerated. The Court considered the good faith requirement to be adequate protection from abusive serial filings.

Id. at 511. In providing guidance on when a second plan may modify the terms of the first, the court states: "A second petition would not necessarily contradict the original proceedings because a legitimately varied and previously unknown factual scenario might require a different plan to accomplish the goals of bankruptcy relief." Elmwood, 964 F.2d at 511-12. In short, Elmwood stands for the proposition that, in proposing yet a second chapter 11 plan, the debtor must demonstrate some sort of genuine need to reorganize as the result of unforeseen changes in circumstance which contribute to the debtor's default under its obligations under the earlier plan. Id. Indeed, in Elmwood, the court cited the national credit crunch in the early 1990s as an example of changed circumstances in real estate markets that might have justified modification of the debtor's earlier plan. But because the credit crunch and resulting depressed real estate market had existed for several years before substantial consummation of the first plan, the Fifth Circuit ruled that those conditions, under the facts of that case, were sufficiently foreseeable that they would not justify a modification of the first plan. Id. at 512.

Arizona bankruptcy courts have recognized that serial chapter 11 filings are permissible if made in good faith. United States v. Shepherd Oil, Inc. (In re Shepherd Oil, Inc.), 118 B.R. 741, 747 (Bankr. D. Ariz. 1990) (citing favorably to Jartran).

-15-

Later case law supports both the principle that serial chapter 11 filings are not <u>per se</u> impermissible, and that a second plan may modify the first plan where there are extraordinary circumstances that are unforeseeable. <u>In re Tillotson</u>, 266 B.R. 565, 569 (Bankr. D. Md. 2001); <u>In re Adams</u>, 218 B.R. 597 (Bankr. D. Kan. 1998); <u>In re Northtown Realty Co., L.P.</u>, 215 B.R. 906, 911 (Bankr. E.D.N.Y. 1998); <u>In re Bouy, Hall & Howard & Assocs.</u>, 208 B.R. 737 (Bankr. S.D. Ga. 1995); <u>In re Casa Loma Assocs.</u>, 122 B.R. 814 (Bankr. N.D. Ga. 1991). Even the Appellants appear to agree that "a confirmed plan of reorganization that has been substantially consummated is not subject to modification by filing a second bankruptcy case <u>unless the second filing is in good faith and necessitated by unforeseeable circumstances</u>." Appellants' Reply Br. at 8 (emphasis added).

The question presented to the Panel is, did the bankruptcy court clearly err in finding that there were extraordinary, unforseeable circumstances present that allowed DNT to propose a second chapter 11 plan that modified the secured creditors' rights under the First Plan? The bankruptcy court found that, while it was a "close call," justification for this extraordinary approach to dealing with DNT's finances existed:

> Those cases do talk about the fact that a simple change in economic circumstances isn't enough. . . . This was, at least in this state, a depression. The level at which things fell off the cliff was not foreseeable in my opinion and more importantly what was not foreseeable was the freeze in the credit markets that would have made it impossible for the Debtor to get refinancing. So, I find in the circumstances of this case that what happened to the economy was the equivalent of an airplane flying into a factory. So that's the finding.

Hr'g Tr. 18:24—19:10, December 22, 2010.

-16-

The bankruptcy court indicated on the record that it had invested time in reviewing real property appraisals connected with this case. Tr. Hr'g 87:18-23, December 22, 2010. It is axiomatic that in a busy bankruptcy court such as Arizona, a bankruptcy judge is frequently exposed to facts and information about how economic conditions in that district affect the parties coming before the court. The bankruptcy judge need not ignore its particular knowledge of such matters; the Supreme Court has endorsed on multiple occasions the principle that a federal judge may take judicial notice of catastrophic economic conditions. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 249 (1978) (discussing "the broad and desperate emergency economic conditions of the early 1930's"); Home Building & Loan Ass'n. v. Blaidsdale, 290 U.S. 398, 445 (1934) (recognizing emergency powers of a state in response to severe economic conditions); Edwards v. Kearzey, 96 U.S. 595, 602-03 (1877) (discussing economic conditions in several states of the South after the Civil War). In short, the bankruptcy court had a legal and evidentiary foundation for its finding of fact that extraordinary circumstances were present in this bankruptcy case.

The Appellants have not challenged the bankruptcy court's analysis of extraordinary market conditions surrounding DNT's reorganization cases. Rather, they contend that the deteriorating real estate market was foreseeable to DNT, observing that immediately following confirmation of DNT's First Plan, its manager admitted that the Arizona real estate market was in decline. But the Appellants confuse two distinct economic conditions: the real estate market (i.e., the supply and demand

-17-

for properties) and the state of the credit market (i.e., the availability of loans for property acquisition and financing).

While the real estate market may have been in decline in 2007 prior to confirmation of the First Plan, the extent of the problems to come in the broader credit market, on which DNT would have to rely for funding of its acquisitions, refinancing, and to fund purchasers of its properties, would devolve into what one court described as a "seizure" following the bankruptcy filing of Lehman Brothers in September 2008. Bd. of Tr. of the AFTRA Ret. Fund v. JP Morgan Chase Bank, N.A., 806 F. Supp.2d 662, 677 (S.D.N.Y. 2011). As it turned out, there was a "crisis in the subprime market that . . . spread to the rest of the real estate market, collapse of the financial markets generally, [and] market-wide liquidity crisis." In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp.2d 258, 264 (S.D.N.Y. 2011). It was this unanticipated collapse in the general availability of credit, not the possibly foreseeable decline in the Arizona housing market, that convinced the bankruptcy court in this appeal to find:

> The level at which things fell off the cliff was not foreseeable in my opinion, and more importantly what was not foreseeable was the freeze in the credit markets that would have made it impossible for the debtor to get refinancing.

Hr'g Tr. 19:3-7, December 22, 2010.

The Appellants offered no evidence to the bankruptcy court, nor have they given us a reasoned argument, to show that the credit market freeze in Autumn 2008 would have been foreseeable when DNT submitted its First Plan in December 2007, or its amended plans in early 2008. Instead of advancing any fully-developed argument why the filing of DNT's second bankruptcy

-18-

case, and the need for its Second Plan, was not under extraordinary and unforseeable circumstances, the Appellants have repeatedly challenged the good faith of DNT in pursuing a second bankruptcy filing. In their briefs, the Appellants suggest that DNT manipulated the bankruptcy system by seeking entry of a final decree, waiting eleven months for entry of that decree without amending its plan, and then filing a second chapter 11 case only four days after entry of the final decree. The facts do not support the Appellants' bad faith argument.

It is true that eleven months elapsed from the time DNT filed its motion and entry of the final decree. But that delay was not solely caused by any lack of diligence on DNT's part. The facts instead establish that DNT submitted the motion for final decree after substantially consummating the First Plan by beginning the distributions to creditors, something the Appellants have not disputed. But three creditors objected to the motion, and in turn moved to revoke confirmation of the First Plan in May. The bankruptcy court decided that it could not enter a final decree while a motion to revoke was on the table, so it ordered that the motions to revoke and for final decree be heard together. After several continuances, the hearing was held on September 2, 2009, at which DNT and the creditors announced a settlement and withdrawal of the motion to revoke. DNT indicated to the court that it would prepare a final decree order.

Shortly thereafter, Appellant Wells Fargo moved to convert the case to chapter 7 on November 11. Again, entry of the final decree was continued along with the conversion motion. After more continuances, the bankruptcy court held a hearing on the

-19-

motion to convert on January 5, 2010. Wells Fargo opted to withdraw the motion to convert, and a joint stipulation doing so was filed on February 5, and approved by the bankruptcy court on February 8, 2010. All objections and impediments to entry of final decree being withdrawn, on February 8, 2010, the court then entered the final decree and order closing the case. In short, the eleven-month delay between filing the motion for final decree and entry of the order was not necessarily the result of delay by DNT, and we find no merit in the Appellants' suggestion that the facts demonstrate a lack of good faith in this respect. Like the bankruptcy court, in light of changing financial conditions, we also find it unsurprising that DNT would quickly file a second petition under chapter 11 within four days. Indeed, according to the testimony of Kinas, DNT's worsening cash flow problems and lack of access to credit threatened the existence of the company at the time of filing the second petition.

**III. The bankruptcy court did not abuse its discretion in confirming the Second Plan and did not clearly err in ruling that the plan met the good faith standard of § 1129(a)(3).**

From the beginning of the second bankruptcy case, the bankruptcy court cautioned the parties that the lynchpin for confirmation of a second plan would center on the requirement that DNT was proceeding in good faith as required in § 1129(a)(3). It is the bankruptcy court's decision on this single confirmation element that forms the basis of the Appellants' appeal.[6]

---

[6] The Appellants have not argued that DNT did not satisfy any of the other § 1129(a) confirmation requirements. While

(continued...)

-20-

Section 1129(a)(3) provides that a bankruptcy court shall confirm a plan only if the "plan has been proposed in good faith and not by any means forbidden by law."  Section 1129(a)(3) does not define good faith.  Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002) (citing In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1994)).  However, under the decisions interpreting this Code provision, a plan may be found to be proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code.  Id.  (citing Ryan v. Loui (In re Corey), 892 F.2d 829, 835 (9th Cir. 1989)); see also Madison Hotel, 749 F.2d at 425 ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.").  The bankruptcy court's good faith determination must be based on the totality of the circumstances.  Smyrnos v. Padilla (In re Padilla), 213 B.R. 349, 352 n.2 (9th Cir. BAP 1997).  The debtor, as plan proponent, has the burden of showing, by a preponderance of the evidence, that its chapter 11 plan is proposed in good faith.  Farmers Home Admin. v. Arnold & Baker Farms, 177 B.R. 648, 653 (9th Cir. BAP 1994).  A bankruptcy court's finding of a debtor's good faith in proposing a

[6](...continued)
there was some discussion by the parties in the bankruptcy court hearings regarding whether the Second Plan was feasible for purposes of § 1129(a)(11), the feasibility question has not been raised in this appeal.

-21-

chapter 11 plan is a finding of fact and reviewed for clear error.  In re Brotby, 303 B.R. at 184.

In this case, while there are facts supporting the bankruptcy court's view that it was a "very, very close call," the court did not clearly err in determining that the plan was proposed in good faith.  The court's analysis on this issue conformed with that dictated by Ninth Circuit case law, in that the bankruptcy court considered the totality of the circumstances.  The court found that the interest rate terms proposed for secured creditors' claims were unchanged between the First and Second Plans.  The repayment term for secured loans under the Second Plan was relatively short, not an extended "stretch out."  As discussed above, the court also determined that § 1127(b) was not a bar to DNT's proposed cramdown in the Second Plan because, the court found, extraordinary, unforseeable circumstances existed as compared to those surrounding confirmation of the First Plan.  And finally, the court determined that, under Arizona's anti-deficiency law, the most a creditor with a lien on a house would likely receive in a liquidation or relief from stay scenario would be the foreclosure value of that property ("All the [creditors] were ever going to get is the value of the property because of the nature of the anti-deficiency statute in Arizona."  Hr'g Tr. 84:7, December 22, 2010.)  Thus, DNT's proposal to pay secured creditors the "market value" was consistent with the value of their state law rights.

The bankruptcy court was correct in this last assumption. In Arizona, two statutes protect borrowers from lenders seeking to collect debt that remains outstanding after foreclosure on the

-22-

house securing a purchase-money loan(s).  See Ariz. Rev. Stat. § 33-729 (2007).[7]  When land is secured by a deed of trust, whether or not the loan was used to purchase the property, the homeowner is protected from those seeking deficiency judgments by Ariz. Rev. Stat. § 33-814 (2007).[8]

The bankruptcy court found, under all these circumstances, that DNT had shown it acted in good faith by filing the second bankruptcy petition and in proposing its Second Plan.  Opposed to this was the Appellants' continuing argument that DNT made a calculated and tactical decision to wait for the first bankruptcy case to be closed rather than in good faith seeking to amend the First Plan.  But the bankruptcy court's finding on good faith

_____

[7] **§ 33-729. Purchase money mortgage; limitation on liability** A. . . . [I]f a mortgage is given to secure the payment of the balance of the purchase price, or to secure a loan to pay all or part of the purchase price, of a parcel of real property of two and one-half acres or less which is limited to and utilized for either a single one-family or single two-family dwelling, the lien of judgment in an action to foreclose such mortgage shall not extend to any other property of the judgment debtor, nor may general execution be issued against the judgment debtor to enforce such judgment, and if the proceeds of the mortgaged real property sold under special execution are insufficient to satisfy the judgment, the judgment may not otherwise be satisfied out of other property of the judgment debtor, notwithstanding any agreement to the contrary. A.R.S. § 33-729 (2011).

[8] **§ 33-814. Action to recover balance after sale or foreclosure on property under trust deed** . . . .
G. If trust property of two and one-half acres or less which is limited to and utilized for either a single one-family or a single two-family dwelling is sold pursuant to the trustee's power of sale, no action may be maintained to recover any difference between the amount obtained by sale and the amount of the indebtedness and any interest, costs and expenses.

-23-

rejected this contention, resolving a disputed question of fact. Even if there are facts to support the Appellants' argument, where there are "two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400-01 (1990).

Having settled the only objection to confirmation under § 1129(a), and finding that all other provisions of that section were satisfied, the bankruptcy court acted properly in deciding to confirm the Second Plan. In doing so, it did not abuse its discretion.

**CONCLUSION**

We AFFIRM the bankruptcy court's order confirming the Second Plan.